**James Ronald MEANES, Appellant,**

v.

**The STATE of Texas, Appellee.**

**No. 68901.**

Court of Criminal Appeals of Texas, En Banc.

Sept. 14, 1983.

Rehearing Denied Nov. 11, 1983.

Murry B. Cohen, Houston, for appellant.

John B. Holmes, Jr., Dist. Atty., James C. Brough, Russell Hardin and Nick Vincent, Asst. Dist. Attys., Houston, Robert Huttash, State's Atty. and Alfred Walker, Asst. State's Atty., Austin, for the State.

## OPINION

TOM G. DAVIS, Judge.

Appeal is taken from a conviction for capital murder. After finding appellant guilty of capital murder, the jury answered "yes" to the two special issues under Art. 37.071(b). Punishment was assessed at death.

Appellant was convicted of intentionally causing the death of Olivero Flores by shooting him with a gun in the course of committing and attempting to commit the robbery of Flores.

The deceased was a guard for the Purolator company. He was murdered on April 21, 1981, in the parking lot of a Sage store near the Gulf Freeway in Houston.

The deceased was walking from the Purolator van toward the store when two

shots were fired by appellant or his accomplice, Carlos Santana. Only one bullet entered the deceased's body. Nobody saw whether appellant or Santana fired the fatal shot. After the deceased was killed, both robbers fired continuously into the van where the deceased's partner, Dorothy Wright, was hiding on the floor.

Witnesses to the robbery-murder testified that one of the robbers carried a shotgun and the other carried a pistol. The medical examiner could not determine whether the bullet that killed the deceased came from a shotgun or a pistol.

Two witnesses identified appellant as the robber with a pistol who shot at the van. Several witnesses stated that both robbers fired at the van.

Three witnesses testified that the robber with the pistol entered the Purolator van on the passenger side while the man with the shotgun drove the van away.

Before the deceased was killed, Wright, who is black, heard a black man say "halt." Two shots rang out and Flores fell. The man who yelled "halt," went over to the deceased, bent down, and fired nine shots at the van.

One of the robbers, a black man carrying a pistol, got into the van, pointed his gun at Wright, and said, "Bitch, get out, you're dead." Wright got out and the robbers drove off.

Crime investigator W.E. Kay of the Houston Police Department recovered nine spent shotgun shells, one live shotgun shell, and eleven spent nine-millimeter shells from the crime scene.

Appellant and his accomplice were captured in a cane patch a few blocks from the Sage store. Appellant told Officer G.W. Rainer where the guns were located and Rainer found the guns in a wooded area nearby. The sufficiency of the evidence is not challenged.

In his first ten grounds of error appellant complains that the trial court committed fundamental error by instructing and permitting the prosecutor to instruct veniremen [1] that the law of parties could be used in answering special issue number one at the punishment stage.

Special issue number one refers to Art. 37.071(b)(1), V.A.C.C.P., which states:

"(b) On conclusion of the presentation of the evidence, the court shall submit the following issues to the jury:

"(1) whether the conduct of the defendant that caused the death of the deceased was committed deliberately and with the reasonable expectation that the death of the deceased or another would result; "

During the voir dire the trial court discussed basic principles of law with each venireman before turning him over to the attorneys for questioning. One of the principles discussed was the law of parties as it relates to the guilt of an accused in a capital case and as it relates to an answer of "yes" to special issue number one at the punishment stage.

The trial court repeatedly used the same hypothetical in explaining the law of parties, as did the State. With one important exception, to be discussed below, the remarks of the trial court and the State on this point did not vary from venireman to venireman.

Representative of these discussions was the following colloquy between the trial court and venireman Betty Frost:

"By the court:

" . . .

"Now, the principle of the law of parties is usable to determine, one; is a person guilty or not guilty. It also could be utilized by the jury in answering the first question. The lawyers, in talking with some of the prospective jurors ahead of you, have indicated they believe the evidence may show there were two people involved in this robbery murder out there at the Sage Store on Gulf Freeway on April 21, I believe was the date. It is conceivable—let's think of a fact situation where two people are acting togeth-

---

1. The ten veniremen in question were subsequently chosen as jurors.

er in the commission of an offense and possibly both have guns but the deceased was only shot one time. Both were shooting but there is only one bullet hole in the deceased. Would you—could you believe that under those circumstances that the law of parties might make both of them equally liable to a yes answer under the first question and they were both acting deliberately and both should have reasonably foreseen death would result?

"A. If they were both shooting I couldn't see it any other way."

Later, the State questioned Frost as follows:

"Q. Second stage you have to answer these two questions. Now I can't give you a fact situation as to whether you would vote yes or no in that question. What I'm talking about is this. Say when the evidence was all over and you had decided both were equally guilty of the crime and you found them both guilty of capital murder. You find the one guy guilty of capital murder even though he and another guy are involved. You go to answer the questions but when you heard the evidence during the trial itself you never would decide one way or the other because of the facts and the circumstances who pulled the fatal trigger. You decided they both pulled triggers but never sure who. Would that fact alone keep you from answering these questions yes or no? Do you see what I mean?

"A. I understand.

"Q. Would you still be able to answer the question either yes—

"A. Yes. I understand you now.

"Q. It's not you. It is me. I guess one way to put it in a blunt way, like over a cup of coffee, we sometimes use the word triggerman and not only triggerman, and the question I guess I'm asking you is the mere fact you could never decide for sure which one pulled the fatal round off, would that keep you from answering one of these questions yes or could you still in some circumstances answer yes if that is what the evidence called for?

"A. Yes."

Appellant contends that, "The trial court never should have instructed any jurors that they could use the law of parties to answer Special Issue No. One at the punishment stage." He objects to the above instructions and questions, and others virtually identical to them, citing *Enmund v. Florida,* 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982); *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), and *Woodson v. North Carolina,* 428 U.S. 280, 96 S.Ct. 2978, 49 L.Ed.2d 944 (1976).

*Enmund,* decided after appellant's trial, stands for the proposition that the death penalty cannot be imposed in the absence of proof that the defendant killed, or attempted to kill, or intended or contemplated that life would be taken.

■ Clearly, the trial court's instruction to venireman Frost *did not authorize her to* answer special issue number one "yes" in violation of *Enmund.*

In both the trial court's and the State's hypotheticals, it is assumed that the gunman attempts to kill his victim or intends or contemplates that life will be taken.

By way of contrast, in *Enmund* the evidence established *only* that the defendant was sitting in a car outside a farmhouse where his friends were killing an elderly couple.

*Lockett* stands, inter alia, for the proposition that the trier of fact in a death penalty case cannot be prevented from considering any mitigating circumstance. *Lockett* and *Woodson* also stand for the proposition that in capital murder cases the Eighth Amendment requires consideration of the character and record of the individual offender and the circumstances of the particular offense as a constitutionally in-

dispensable part of the process of inflicting the penalty of death.

█ We see nothing in the remarks of the trial court (or the State) to venireman Frost which violates the principles of *Lockett* and *Woodson.* The trial court never informed Frost that she *had* to render a guilty verdict or answer special issue number one yes in the case of the hypothetical gunman who shot but did not hit his target. Instead she was asked by the court, "... *could* you believe that under those circumstances that the law of parties *might* make both of them equally liable to a yes answer under the first question ...?" (Emphasis added).

Similarly, the State asked Frost, "... *could* you still *in some circumstances* answer yes *if that is what the evidence called for?"* (Emphasis added).

Thus, Frost was never told that she could not consider the character and record of the offender, the circumstances of the offense, or any other mitigating factor. No violation of *Lockett* or *Woodson* can be found in the remarks to Frost.

Six of the remaining nine veniremen were instructed in the law of parties in language virtually identical to that used with Frost. There was a small but significant difference, however, with respect to the other three veniremen.

Representative of the questioning of these three was the following exchange between the trial court and venireman Leroy McCarter:

"Q. The law of parties. Two or more people act together in the commission of an offense. I may not have—we have a principle of law known as the law of parties. That is, if two or more people act together in the commission of an offense they are equally guilty. It goes so far that if one adopts the action of another as his own, they are both equally guilty. A fact situation: Two people go into a bank, both armed. They get in the bank. Committing the robbery, they both shoot. One teller is killed, only one bullet hole in the teller. Both of them—under those circumstances would you agree they would be equally guilty?

"A. Yes.

"Q. If you will answer out.

"A. Yes.

"Q. The law of parties you could use not only to determine guilt or innocence. You could also use it in answering the first question up there. In the supposed fact situation I gave you. Obviously, under the facts as I told you, only one person actually pulled the trigger that fired the one fatal bullet that killed the teller; right?

"A. Yes, sir.

"Q. But if both of them are in there, both armed and both firing, would you agree whichever one it was that did not fire the fatal bullet still was acting deliberately and with reasonable expectation that death could result?

"A. Yes."

█ In this discussion and the other two like it, the venireman was not asked if he *could* or *might* find the hypothetical gunman who did not fire the fatal shot guilty, or if he *could* answer special issue number one "yes." The venireman was instead asked, "... would you agree they *would* be equally guilty?" (Emphasis added.) With respect to the punishment stage, McCarter was asked to agree that the gunman, "still was acting deliberately and with reasonable expectation that death could result."

Once again this hypothetical presents no problem under *Enmund* since the gunman intended or contemplated that life would be taken.

Arguably, the complained of remarks by the court may raise a question under *Lockett* and *Woodson* since the veniremen were asked if they would agree under the hypothetical circumstances that both parties were guilty without any mention of mitigating circumstances.

Nevertheless, we do not find that the trial court's remarks constituted reversible error. No objection was made to the allegedly improper remarks, and nothing was preserved for review. *Esquivel v. State*, 595 S.W.2d 516 (Tex.Cr.App.1980). Unlike *Enmund*, both *Lockett* and *Woodson* were decided prior to appellant's trial.

Appellant's first ten grounds of error are overruled.

In his eleventh ground of error, appellant complains of ineffective assistance of counsel because his trial attorney failed to object to the court's instructions to veniremen that they could use the law of parties in answering special issue number one.

As we noted in our discussion of grounds of error one through ten, most of the trial court's remarks to the ten veniremen were proper. The arguably improper remarks, given the context in which they were made, were not such that a counsel's failure to object would render him ineffective. This is true even though the decision in *Lockett v. Ohio*, supra, was more than three years old at the time.

The remarks were made in the context of trying to explain the law of parties to the jurors as it relates to guilt or innocence and punishment in a capital murder case. The trial court was not attempting to explain what factors, mitigating or otherwise, could be considered at the punishment stage.

■ An accused is entitled to counsel likely to render and rendering reasonably effective assistance of counsel. *Ex parte Duffy*, 607 S.W.2d 507 (Tex.Cr.App.1980).

■ Generally, ineffective assistance of counsel cannot be established by separating out one portion of the trial counsel's performance for examination. *Bolden v. State*, 634 S.W.2d 710 (Tex.Cr.App.1982). The sufficiency of an attorney's assistance must be gauged by the totality of the representation of the accused. Appellant's eleventh ground of error is overruled.

■ In his twelfth ground of error appellant maintains he was denied effective assistance of counsel when his attorney failed to move to strike for cause every juror listed in grounds of error one through ten because they stated they would treat the culpability of a triggerman and non-triggerman the same in answering special issue number one at the punishment stage. In fact, none of the veniremen stated that they would treat a triggerman and a non-triggerman the same. The hypothetical posed to the veniremen involved two gunmen, one of whom shot at a victim and missed, while his cohort shot and hit the victim. To accept appellant's argument would require us to pass on answers by veniremen which are not reflected by the record. The ground of error is overruled.

■ In his seventeenth ground of error appellant contends that the trial court erred in denying him a charge on circumstantial evidence at the guilt-innocence stage. Such a charge is no longer required in Texas. *Hankins v. State*, 646 S.W.2d 191 (Tex.Cr.App.1983).

■ In his eighteenth ground of error appellant asserts that the court's charge on guilt-innocence was fundamentally erroneous because it included an instruction on the law of parties although appellant was never indicted as a party. Appellant is aware of our line of cases holding that a trial court may charge the jury on the law of parties even though there is no such allegation in the indictment. *English v. State*, 592 S.W.2d 949 (Tex.Cr.App.1980); *Pitts v. State*, 569 S.W.2d 898 (Tex.Cr.App. 1978). He urges us to overrule this line of cases. We decline to do so. Appellant's eighteenth ground of error is overruled.

In his fourteenth ground of error, appellant complains that the court erred by granting the State's motion to strike venireman Sandra Gail Richardson. Appellant contends that Richardson was excused in violation of *Witherspoon v. Illinois*, 391 U.S. 510, 88 S.Ct. 1770, 20 L.Ed.2d 7776 (1968), in that she had not irrevocably committed herself to vote against the death penalty regardless of the facts and circumstances adduced at trial. According to ap-

pellant, Richardson was the classic equivocating venireman.

Richardson did give the trial court inconsistent answers as to her ability to answer "yes" to special issues number one and two. She was then turned over to attorneys for the State and appellant for questioning. The following exchange took place between the State and Richardson:

"Q. ... Let me ask you do you envision any set of circumstances in your mind where you could participate with the rest of the jury in giving someone the death penalty?

"A. I've thought of this all night long. I knew you were going to ask me this. I honestly would have to say I probably could not give the death penalty.

"Q. Would you say then under no set of circumstances you could give the death penalty; is that right?

"A. That's right. I think that life in prison would do the job.

"Q. So then what you are telling me is that what you told the judge earlier was incorrect, that you could consider the death penalty?

"A. That's correct."

Appellant's counsel then questioned Richardson. After he explained the first two special issues to her, Richardson stated that she could answer them "yes" if the evidence called for it.

The court then intervened and the following dialogue occurred:

"THE COURT: That's contrary to what you stated awhile ago, isn't it?

"JUROR: I'm not following the two questions at all. For some reason my mind is not following those.

"THE COURT: You understand if you answer both the questions yes I will assess the defendant's punishment at death?

"JUROR: I see what you're saying. Okay. My answer is no to that.

" ...

"THE COURT: Mr. Hinton asked you a little while ago if you sat as a juror and you believed those questions should be answered yes, would you answer them yes, and you said, yes, you would, didn't you?

"JUROR: Yes.

"THE COURT: Then I took you and said, that's contrary to what you said to me a few minutes ago, wasn't it?

"JUROR: That's right.

"THE COURT: What is right?

"JUROR: I was not following Mr. Hinton. I would say no to both of those.

"THE COURT: In order to keep the defendant from getting the death penalty; is that the reason?

"JUROR: Yes.

"THE COURT: Sustain the challenge.

" ...

"MR. HINTON: Please note our exception ..."

■ Clearly, at this point Richardson was on record as irretrievably opposed to answering the special issues "yes" under any circumstances. Her answers appear to have been well thought out. She explained that her inconsistency resulted from a failure to understand defense counsel's questions. Appellant's counsel did not choose to question Richardson further. Appellant's fourteenth ground of error is overruled.

■ In his thirteenth ground of error appellant asserts he was denied effective assistance of counsel when his attorney failed to object to the striking for cause of venireman Marie C. Wert due to her purported inability to assess the death penalty.

No such objection was necessary since Wert was properly excused. Wert was questioned closely by the trial court. She was somewhat equivocal in her early answers.

Wert stated that she believed in the death penalty in some cases, but did not know if she could assess it. She also stated she had conscientious scruples against the infliction of death as a punishment in a proper case. Finally, the trial court asked her:

"Q. ... is your feeling against the death penalty so strong that no matter what the facts were that you as a juror could never vote to assess the death penalty?

"A. I don't think I could.

"...

"Q. You couldn't, no matter what the circumstances are, you as a juror could never vote to assess the death penalty?

"A. No.

"MR. HARDIN: The state would move—

"THE COURT: Any questions, Mr. Hinton?

"MR. HINTON: Not at this time. The Court would not put the Defense in the posture to ask future prospective jurors—

"THE COURT: No. I'm talking about Ms. Wert.

"I believe under the law I have to excuse you ..."

It appears Wert was irrevocably opposed to assessing the death penalty and she was not excused in violation of *Witherspoon.* Thus counsel was under no obligation to object. There is no complaint on appeal that counsel should have questioned Wert further. Appellant's thirteenth ground of error is overruled.

In his fifteenth ground of error, appellant contends the trial court erred by admitting into evidence the bloody shirt worn by the deceased at the time he died.

In *Bradford v. State,* 608 S.W.2d 918 (Tex.Cr.App.1980), we held that if a verbal description of the body and scene are admissible, the clothing worn by the victim of the offense, even if bloodstained, is admissible, unless the clothing is offered solely to inflame the minds of the jury.

 Appellant contends that the deceased's shirt was offered solely to inflame the minds of the jury. We disagree. Chemist Robert Warkenton testified that the discoloration on the shirt was blood, that the holes in the shirt were bullet holes, that the nitrates on the shirt tended to show that the shot or shots were fired less than four feet from the shirt, and that the pattern of the bullet holes indicated a shotgun could not have been used. The shirt itself could obviously have been useful in emphasizing these relevant points. Appellant's fifteenth ground of error is overruled.

In his sixteenth ground of error appellant contends the trial court erred in denying appellant's objection to the jury charge, because the charge failed to include a definition of murder and capital murder.

Though there was no abstract definition of capital murder or murder in the charge, the court did charge the jury in the following terms in the application paragraph:

"Now, therefore, if you believe from the evidence beyond a reasonable doubt that in Harris County, Texas, on or about April 21, 1981, the defendant did, either acting alone or together with Carlos Santana as a party (as that term is above defined) while in the course of committing or attempting to commit the robbery of Olivero Flores, intentionally cause the death of Olivero Flores by shooting him with a gun, you will find the defendant guilty of capital murder."

In *Quinones v. State,* 592 S.W.2d 933, 945 (Tex.Cr.App.1980), this Court responded to an identical complaint about a jury charge that differed from the one above only with respect to the underlying offense and instruction on parties. There we stated:

"This charge required the jury to find all of the constituent elements of the offense of capital murder in order to return a guilty verdict. Appellant argues that the charge does not define the offense of murder. This is incorrect. Murder was defined in that portion of the charge which applied the law to the facts and, with the exception of the culpable mental state which the court did define elsewhere, the definition employed terms of common understanding."

Though no objection was made to the jury charge in *Quinones,* the logic of our

reasoning there applies equally well to the instant case.

■ Capital murder was, in effect, defined in the application paragraph. Appellant does not state how he was harmed by the absence of an abstract charge on capital murder.

As in *Quinones*, the application paragraph required the jury to find all of the constituent elements of murder. The definition employed terms of common understanding with the exception of the culpable mental state and the concept of parties, which were defined elsewhere in the charge. Appellant's sixteenth ground of error is overruled.

In his final ground of error appellant maintains that Art. 37.071(b)(1) is unconstitutional as applied in this case because, "its language indicates that the law of parties applies in answering it at the punishment stage."

Appellant focuses on the language of special issue number one as applied in the punishment charge which asks the jury to determine whether, "the conduct of the defendant *that caused the death of the deceased* was committed deliberately and with the reasonable expectation that the death of the deceased or another would result." (Emphasis added.)

Appellant next notes that he testified at the punishment stage and denied firing the bullet that killed the deceased. He further denied any intent or expectation to kill any person and stated that his sole intent was to participate in an armed robbery.

According to appellant, the language of special issue number one, "conduct of the defendant that caused the death of the deceased," interfered with and even prevented the jury from giving proper weight or any weight to his mitigating testimony. The language in question assumed the existence of the issue in favor of the State, because it assumed that it was the conduct of the defendant, rather than his accomplice, that caused the death of the deceased, before going on to ask if that conduct was committed deliberately and with the expectation that death would result.

■ We disagree with appellant's analysis. In the first place, special issue number one clearly focuses the jury's attention on the individual defendant by asking if the "conduct of the defendant" was committed deliberately and with the reasonable expectation that death would result.

The question does assume that the defendant's conduct caused the death of the deceased for the very simple reason that the jury has already found this to be so. Before special issue number one can ever be broached, the jury must have determined that a defendant, acting alone or as a party, has committed capital murder.

Appellant notes that the jury might very well have convicted him only as a party and argues, "It is entirely insufficient to say that it was the conduct of the Defendant acting as a party with his co-defendant which caused the death of the deceased. That is an application of the law of parties at the punishment stage." Such an application is prohibited by *Enmund v. Florida*, supra, under appellant's view.

Underlying appellant's entire thesis is a fundamental misapprehension of *Enmund*. *Enmund* does not prevent, under all circumstances, imposition of the death penalty against one convicted, as a party, of capital murder. *Enmund* prohibits assessment of the death penalty against any defendant who did not kill, attempt to kill, or intend or contemplate that life would be taken.

In the instant case there was ample evidence before the jury that appellant killed, attempted to kill, or intended to kill the deceased.

Further, there is no conceivable way the jury could have convicted appellant and answered special issue number one "yes" on a theory that he was merely a party who did not intend to kill the deceased. The court's charge at the guilt-innocence stage defined criminal responsibility in the language of V.T.C.A. Penal Code, Sec. 7.02(a)(2). The jury was told that:

"A person is criminally responsible for an offense committed by the conduct of another if, *acting with intent to promote or assist the commission of the offense*, he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense. Mere presence alone will not constitute one a party to an offense." (Emphasis added.)

The jury found appellant guilty either because he intentionally killed the deceased in the course of a robbery or because he intentionally solicited, encouraged, directed, aided, or attempted to aid Santana in the latter's efforts to kill the deceased in the course of a robbery.

Thus, the jury at the punishment stage, could not have answered special issue number one "yes" in violation of *Enmund*.

The judgment is affirmed.

CLINTON, Judge, concurring.

I agree with Judge Tom Davis's able analysis which concludes no reversible error is presented in this case by either appellant's grounds of error one through ten,[1] or by his final ground of error.[2] Because of their limited factual contexts, the questions posed to selected jurors concerning their ability to answer the deliberateness question "yes" relative to an individual defendant who may not have hit the victim, but who was shooting at him and clearly attempting to hit him, do not compel reversal of appellant's conviction. Accordingly, with but one objective in writing separately, I join the opinion and judgment of the Court.

I write only to make explicit what is clearly implicit in Judge Davis's rationale:

It *is* error to apply directly the law of parties to any of the punishment issues in a capital murder case—that is, so a capital defendant may be punished for the deliberate conduct of another, the future dangerousness of another or the unreasonable response to provocation by another—without regard to the individual conduct of the defendant whose fate is in question.[3]

Since the hypothet circumscribing the improper communication here did not require or even lend itself to an application of the law of parties to find "deliberateness," it is in the best tradition of judicial restraint that Judge Davis has avoided directly addressing the viability of *Wilder and Armour v. State*, 583 S.W.2d 349 (Tex.Cr.App. 1979) which found the evidence of Armour's "deliberateness" sufficient solely on the basis of Wilder's conduct, through application of the law of parties.[4] Nevertheless, I am alarmed by the increasing number of cases implicating *Wilder and Armour* and believe it behooves us to provide guidance to the bench and prosecution bar today—to warn them and, hopefully, to avert future reversals of death sentences which are constitutionally infirm[5] simply because an untenable interpretation of state law technically has not been closely examined by the Court. My purpose then, is to provide that scrutiny.

STATE LAW OF PARTIES

V.T.C.A. Penal Code, § 7.01, entitled "Parties to Offenses" provides:

(a) A person is *criminally responsible* as a party to an *OFFENSE* if the *offense* is committed by his own conduct,

---

1. As stated by Judge Davis, appellant's first ten grounds of error complain of the trial court "instructing and/or permitting the prosecutor to instruct veniremen that the law of parties could be used in answering special issue number one at the punishment stage."

2. According to Judge Davis, appellant's final ground of error claims that "Art. 37.071(b)(1) is unconstitutional as applied in this case because, 'its language indicates that the law of parties applies in answering it at the punishment stage.' "

3. It quickly follows that prospective jurors may not be *informed* that such an application is permitted, and that it was error in this case to so inform them, albeit not reversible error.

4. The evidence was undisputed that Armour was the "wheel man" and waited in the car while Wilder committed the aggravated robbery and, ultimately, the capital murder.

5. See *Enmund v. Florida*, 458 U.S. 782, 102 S.Ct. 3368, 73 L.Ed.2d 1140 (1982).

the conduct of another for which he is criminally responsible, or by both.

(b) Each party to an offense may be charged with *commission of the OFFENSE.*

(c) ... [E]ach party to an offense may be *charged and CONVICTED* without alleging that he acted as a principal or accomplice.

V.T.C.A. Penal Code, § 7.02, entitled "Criminal Responsibility for Conduct of Another" provides:

(a) A person is criminally *responsible for an OFFENSE* committed by the conduct of another if:

\* \* \* \* \* \*

(2) acting with intent to promote or assist the *commission of the offense,* he solicits, encourages, directs, aids, or attempts to aid the other person to commit the offense; \* \* \*

(b) If, in the attempt to carry out a conspiracy to commit one *felony,*[6] another *felony* is committed by one of the conspirators, all conspirators are *GUILTY of the felony* actually committed though having no intent to commit it, if the *offense* was committed in furtherance of the unlawful purpose and was one that should have been anticipated as a result of the carrying out of the conspiracy.

It is unambiguous that the law of parties provided by the penal code applies only to the jury's consideration of an accused's *guilt* for the *commission* of an *offense* in the first stage of our bifurcated felony trial procedure.[7]

This conclusion is fortified by the language of Article 37.071(b)(1)–(3), V.A.C. C.P. which provides unique criteria for assessment of the penalty of death in capital cases; the so-called "special issues" have been framed in parallel construction by the Legislature and, as Judge Davis also observes, each issue clearly directs consideration of the conduct of the individual defendant:

(1) whether the *conduct*[8] *of the defendant* that caused the death was committed deliberately and with the reasonable expectation that the death of the deceased or another would result;

(2) whether there is a probability that *the defendant would commit* criminal acts of violence that would constitute a continuing threat to society; and

(3) if raised by the evidence the *conduct of the defendant* in killing the deceased was unreasonable in response to the provocation, if any, by the deceased.

While it is true that submission of these special issues is mandatory in assessing the penalty for one found *guilty* of the *offense* of capital murder through application of the law of parties, it is improper to assume that those issues must be answered for such a defendant exactly as they would be for a codefendant whose conduct actually caused the death involved.[9] Obviously, the culpable "conduct" of codefendants is different, and though the "criminal responsi-

6. " 'Felony' means an *OFFENSE* so designated by law or punishable by death or confinement in a penitentiary." (All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.)

7. Article 37.07, § 2(a) directs:
In all criminal cases, other than misdemeanor cases ..., which are tried before a jury on a plea of not guilty, the judge shall, before argument begins, first submit to the jury the issue of *guilt or innocence* of the defendant *of the offense* or offenses charged, without authorizing the jury to pass upon the punishment to be imposed.

8. " 'Conduct' means an act or omission and its accompanying mental state." V.T.C.A. Penal Code, § 1.07(a)(8).

" 'Act' means a bodily movement whether voluntary or involuntary and includes speech." V.T.C.A. Penal Code, § 1.07(a)(1).

9. In discussing the tenet that individualized sentencing in capital cases is constitutionally required, the Supreme Court of the United States noted, in *Lockett v. Ohio,* 438 U.S. 586, 98 S.Ct. 2954, 57 L.Ed.2d 973 (1978), 98 S.Ct. at 2964:
"That States have authority to make aiders and abettors equally responsible as a matter of law, with principals, or to enact felony murder statutes is beyond constitutional challenge. But the definition of crimes generally has *not been thought* automatically to dictate what should be the proper penalty. [citations omitted]"

bility" for purposes of a determination of *guilt* is the same, once a finding of guilt is made, the jury is confronted with substantively different questions [10] regarding the propriety of *punishment* for the individual defendants.

It is apparent then that while a capital murder defendant may be held "criminally responsible"—and therefore found guilty—through application of our law of parties, the determinations made by the jury in answering the special issues dictated by Article 37.071(b), supra, must be made solely upon consideration of the particularized conduct of the individual defendant which, by virtue of §§ 7.01 and 7.02, supra, contributed to another's causing the death of the victim.

Thus, it can be seen that the suggestion in *Wilder and Armour* that the law of parties can supply evidence otherwise lacking upon a punishment issue, is patently unsupported by the language of pertinent state statutes.

### ERRONEOUS READING OF PRIOR DECISIONS

But then the opinion in *Wilder and Armour* did not undertake the analysis of relevant state statutes which is made above; instead, that opinion simply claimed prior decisions—primarily *Livingston v. State,* 542 S.W.2d 655 (Tex.Cr.App.1976)—"held that Sections 7.01 and 7.02 apply to ... Article 37.071, V.A.C.C.P." 583 S.W.2d at 356. However, dissecting the decisions cited by *Wilder and Armour* belies the accuracy of that claim.

In *Smith v. State,* 540 S.W.2d 693 (Tex. Cr.App.1976) this Court in passing upon the sufficiency of the evidence to support the

death penalty "generally," stated at 696–697:

> There was no evidence that [Smith] was in any way under the domination of anyone, nor was he under any mental or emotional pressure. He simply went out to rob and was the first person who tried to kill his victim (according to his oral confession).[11] After the killing, he testified, he paused long enough to secure a pistol from under the counter and when a cigar box containing coins spilled, he paused to recoup the coins. His entire conduct was calculated and remorseless....

These *facts* were held to be sufficient to support the jury's finding on the deliberateness question and, indeed, correctly so. However, Smith also argued on appeal that Special Issues (1) and (3) *should not be submitted* in a case where the defendant is only charged and found guilty as a principal. In rejecting such a contention, the Court stated:

> To agree with such a contention would require that we ignore this Court's interpretation of the law of principals. Earlier in the opinion we declined to do so. 540 S.W.2d at 697.

Earlier in the opinion the Court had determined, contrary to Smith's contention, that upon application of the law of principals, the evidence was sufficient to support the *conviction,* or, to restate it, the jury's finding of *guilt* for the *offense* of capital murder.

Thus, the Court did not determine in *Smith,* supra, that the deliberate conduct of Howie Ray Robinson which caused the death of the victim in that case, constituted sufficient evidence to support the jury's finding on the first special issue in Smith's

---

**10.** Against the constitutional challenge that the special punishment issues in the Texas capital murder scheme "merely repeat issues already decided" at the guilt phase, then Texas Attorney General John L. Hill assured the United States Supreme Court that, as drafted, the punishment issues had been (and impliedly, *would* be) construed as showing "a real basis for distinguishing among defendants." Oral argument on the constitutionality of Texas death penalty procedure in *Jurek v. Texas,* 428 U.S. 262, 96 S.Ct.

2950, 49 L.Ed.2d 929 (1976). *Accord: Heckert v. State,* 612 S.W.2d 549 (Tex.Cr.App.1981) [holding "intentionally" is not the same as "deliberately"].

**11.** According to Smith's oral confession, he attempted to shoot the victim, but his gun misfired; he then called out to his coprincipal "get him" and Howie Ray Robinson shot the victim to death.

trial. Rather, it was conduct of the individual defendant, Smith, which aided and encouraged Robinson in causing the death,[12] that justified the jury's affirmative finding in his own trial.

In *Livingston,* supra, the appellant assailed the sufficiency of the evidence to support the jury's verdict of *guilt.* In rejecting the contention, the Court held:

> In *Smith* [citation omitted], a capital murder conviction under Article 1257, Vernon's Ann.P.C. (immediate forerunner of V.T.C.A. Penal Code, Sec. 19.03), and Art. 37.071, it was held that a defendant could be *convicted* of murder despite the fact that it was the co-defendant who killed the deceased during the course of the robbery in light of the law of principals then in effect. See also *Thompson v. State,* 514 S.W.2d 275 (Tex. Cr.App.1974).
>
> We do not construe ... Sections 7.01 and 7.02 of the new penal code to call for a different result, nor do we understand appellant to so contend.

542 S.W.2d 660.

So, in both *Smith* and *Livingston,* the Court approved the application of the law of criminal responsibility to the *guilt phase* of those capital murder trials, and concomitantly found the evidence sufficient to sustain the jury verdicts that those defendants were *guilty* of the respective capital murder offenses charged against them. The dispositions of *Smith* and *Livingston* in this regard, are clearly sound.

But, in neither *Smith* nor *Livingston,* was the evidence deemed sufficient to support the affirmative finding on the first *punishment issue* in those capital murder cases, through application of the law of parties, as the opinion in *Wilder and Armour* would have it.

It is also important to note the exact contention made by Armour on appeal; according to the Court's opinion:

> "In his first ground of error, Armour alleges that the evidence was insufficient under Article 37.071, V.A.C.C.P., to show he either *caused the death of the deceased* or committed the act deliberately and with the reasonable expectation that death would result *because he did not actually kill the deceased."*

583 S.W.2d at 356. Obviously, the fact that a defendant "did not actually kill the deceased" does not necessarily mean that *his own culpable conduct*[13] in contributing to the murder was not done "deliberately and with the reasonable expectation that the death of the deceased ... would result." The facts in both *Smith* and the instant case exemplify instances in which nontriggermen[14] were shown by their contributing conduct to be not only expecting a resulting death, but also offering deliberate assistance to that end; and the jury's respective "yes" answers on the "deliber-

---

12. The law in effect at the time of the commission of the capital murder in *Smith* which authorized the jury's finding of guilt follows:

"All persons are principals who are guilty of acting together in the commission of an offense."

Vernon's Ann. P.C., Article 65.

"When an offense is actually committed by one or more persons, but others are present, and knowing the unlawful intent, *aid by acts* or *encourage by words or gestures,* those actually engaged in the commission of the unlawful act, or who, not being actually present, keep watch so as to prevent the interruption of those engaged in committing the offense, such persons *so aiding, encouraging* or keeping watch are principal offenders."

Vernon's Ann.P.C., Article 66.

"All persons who shall engage in *procuring aid, arms* or means of any kind to assist in the commission of an offense, while others are executing the unlawful act, and all persons who endeavor at the time of the commission of the offense to *secure the safety* or concealment *of the offenders* are principals."

Vernon's Ann.P.C., Article 68.

"Any person who *advises or agrees* to the commission of an offense *and* who *is present* when the same is a principal whether he aid or notice the illegal act."

Vernon's Ann.P.C., Article 69.

13. "Culpable" by virtue of the law of parties.

14. As I understand the facts in the instant case, there was simply inconclusive evidence as to whether it was appellant or his confederate who fired the fatal bullet.

ateness question" find ample support in the evidence in each case.

Thus, the opinion in *Wilder and Armour* relied upon an erroneous reading of *Livingston* and *Smith* for its conclusion that the jury may find affirmatively on the "deliberateness question" at the trial of a "wheel man," if they only find that the "triggerman's" conduct was committed deliberately and with the reasonable expectation that the death of the deceased would result. By virtue of the misplaced reliance, a careful analysis of the issue was apparently thought to be unnecessary in *Wilder and Armour;* but, as I have demonstrated, scrutiny of the purported rationale of that case mandates our disapproval of it.

There is no conceivable way an application of the law of parties to the punishment issues in appellant's trial could have contributed to his death sentence;[15] so, erroneous communication to selected jurors that such an application be made was harmless beyond a reasonable doubt.

I concur in the opinion and judgment of the Court.

---

**15.** But that is not to say, of course, that the law of parties has any application to sufficiency of evidence to support a finding on the deliberateness issue.